**UNITED STATES of America ex rel. Roberto Santiesteban CASANOVA, Relator,**

v.

**Walter W. FITZPATRICK, Warden, Federal Detention Headquarters, Respondent.**

United States District Court
S. D. New York.
Jan. 16, 1963.

Rabinowitz & Boudin, New York City, for relator; Leonard B. Boudin, Victor Rabinowitz, Mary M. Kaufman, Arthur Schutzer, Henry Winestine, Michael B. Standard, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, New York City, for respondent; Vincent L. Broderick, Chief Asst. U. S. Atty., Sheldon H. Elsen, Arnold M. Enker, Arthur I. Rosett, Asst. U. S. Attys., of counsel.

WEINFELD, District Judge.

The petitioner, Roberto Santiesteban Casanova, seeks his release from custody on a writ of habeas corpus on the ground of lack of the Court's jurisdiction over his person. He is under arrest and detention by virtue of a two-count indictment wherein he, two codefendants and two others not named as defendants are charged with conspiracy to commit sabotage and to violate the Foreign Agents Registration Act.[1] He was originally arrested on a warrant issued by the United States Commissioner, based upon a complaint, and held in $250,000 bail fixed by the Commissioner. Thereafter, following his indictment by a grand jury, this Court set bail in the sum of $75,000, which it later reduced to $50,000. Petitioner has been confined since his arrest in default of bail.

Petitioner contends he is entitled to *diplomatic immunity and is not subject to Federal arrest, detention or prosecution.* The basic facts upon which his claim to immunity rests are not in dispute. He is a Cuban national, appointed by his government as an attache and Resident Member of the Staff of the Permanent Mission of Cuba to the United Nations, hereafter referred to as the "Cuban Mission." He entered the United States on October 3, 1962 with a diplomatic passport issued by his own government, a nonimmigrant visa issued by our Department of State, and a landing card issued by the Immigration and Naturalization Service. From the time of his

1. 18 U.S.C. §§ 2155(b), 371 (1958).

admission to the United States to the date of his arrest on November 16th he was employed as a Resident Member of the staff of the Cuban Mission.

Petitioner contends that he enjoys diplomatic immunity from arrest and prosecution under (1) Article 105 of the United Nations Charter, (2) Section 15 (2) of the Headquarters Agreement of the United Nations, and (3) the Law of Nations. He further contends that even if his claim to immunity is overruled, nonetheless the writ must be sustained, since the Supreme Court of the United States has exclusive and original jurisdiction to try him under Article III of the Constitution of the United States and section 1251 of Title 28, United States Code.

Before considering his contentions, it is desirable to localize the issue with which we deal. The petitioner is not a member of a diplomatic staff accredited to, and recognized by, the United States Government.[2] He is not a representative to,[3] or an employee of,[4] the United Nations. His claim to diplomatic immunity derives solely from his status as a Resident Member of the Cuban Permanent Mission to the United Nations. Whatever right to immunity exists must be considered within the context of that status.

A. THE CLAIM OF DIPLOMATIC IMMUNITY UNDER THE UNITED NATIONS CHARTER.

Article 105 of the Charter of the United Nations provides as follows:[5]

"1. The Organization shall enjoy in the territory of each of its Members such privileges and immunities as are necessary for the fulfillment of its purposes.

"2. Representatives of the Members of the United Nations and officials of the Organization shall similarly enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization.

"3. The General Assembly may make recommendations with a view to determining the details of the application of paragraphs 1 and 2 of this Article or may propose conventions to the Members of the United Nations for this purpose."

■ The thrust of the relator's contention is that the declaration in section 2 is self-executing and requires absolute diplomatic immunity be accorded to representatives of members and their staffs. The argument rests upon the postulate, universally recognized in international law, that diplomatic agents are accorded immunity from judicial process so that their governments may not be hampered in their foreign relations by the arrest or harassment of, or interference with, their diplomatic representatives.[6] Petitioner urges that this rationale applies with equal force to the members of a mission to the United Nations and its staff; that unless they enjoy diplomatic immunity they can be prevented from fulfilling their diplomatic functions vis-a-vis the United Nations, if the host country, in this instance the United States, were able to arrest and detain them— in short, that diplomatic immunity is required to assure the independence of the Organization and its members in the discharge of their duties and functions. Accordingly, he contends that Article 105 intended, and in fact confers, full dip-

2. Compare In re Baiz, 135 U.S. 403, 10 S.Ct. 854, 34 L.Ed. 222 (1890).

3. Compare Tsiang v. Tsiang, 194 Misc. 259, 86 N.Y.S.2d 556 (Sup.Ct.1949).

4. Compare United States v. Melekh, 193 F.Supp. 586 (N.D.Ill.1961); United States v. Melekh, 190 F.Supp. 67 (S.D. N.Y.1960).

5. 59 Stat. 1033, 1053 (1945).

6. See American Law Institute, Restatement, The Foreign Relations Law of the United States, § 76, comment a (Proposed Official Draft, 1962) (hereinafter cited as RESTATEMENT); Barnes, Diplomatic Immunity From Local Jurisdiction: Its Historical Development Under International Law and Application in United States Practice, 43 Dept. of State Bulletin 173, 177 (1960).

lomatic immunity. The language of Article 105, its history, as well as subsequent acts by the United States and the United Nations, require rejection of petitioner's claim that by its own force full diplomatic immunity was either intended or granted by the Article.[7]

Significantly, the words "diplomatic immunity" nowhere appear in Article 105. Events preceding its adoption point up the reason. Some delegate nations to the San Francisco Conference of 1945 had proposed that the Charter contain a provision granting traditional "diplomatic privileges and immunities" to representatives of member nations, officials of the United Nations Organization and their respective staffs. These and other proposals were referred to Committee IV/2 which had been established by the Conference to prepare provisions relating to juridical problems under the Charter.[8]

The Committee, in recommending what in substance is now Article 105, emphasized that it deliberately avoided the term "diplomatic" immunity—the one term which by international law and usage accorded pervasive immunity. The Committee "preferred to substitute a more appropriate standard, based, * * in the case of the representatives of its members and officials of the Organization, on the independent exercise of their functions." And recognizing that even this limited immunity required further definition and implementation, section 3 was recommended and adopted.[9]

Likewise, the American authorities, in explaining the meaning of the various provisions, make it abundantly clear that Article 105 in and of itself was not intended to confer diplomatic immunity. The Secretary of State, Chairman of the United States Delegation to the San Francisco Conference which gave birth to the Charter, reported to the President of the United States:[10]

" * * * Article 105 stipulates that the Organization itself, the representatives of the Members and the officials of the Organization shall have the 'necessary' privileges and immunities.

\* \* \* \* \* \*

"It would have been possible to make the simple statement that all of these officials and representatives would have diplomatic privileges and immunities but it is not necessarily true that these international officials will need precisely the same privileges and immunities as are needed by the diplomatic representatives of individual states. It accordingly seemed better to lay down as a test the necessity of the independent exercise of the functions of the individuals in connection with the Organization."

Similarly, the testimony before the Senate Committee on Foreign Relations of the State Department's expert on the Charter indicates that diplomatic immunity under Article 105 was not intended.[11]

---

7. See RESTATEMENT, op. cit. supra, note 6, §§ 149–57, for rules and a collection of authorities on the interpretation of international agreements.

8. United Nations Secretariat, Handbook on the Legal Status, Privileges and Immunities of the United Nations, Notes on the Drafting of Articles 104 and 105 of the United Nations Charter, 16 (1952) (hereinafter cited as HANDBOOK).

9. Id. at 21–22. See generally, 2 United Nations General Assembly Official Records, 2d Sess.1947, Plenary Meetings, 1519–24.

10. The Report to the President on the Results of the San Francisco Confer-

ence by the Chairman of the United States Delegation, the Secretary of State, 158–59 (1945), reprinted in, Committee on Foreign Relations, United States Senate, 79th Cong., 1st Sess., Hearings on The United Nations Charter, 103–104 (Committee Print 1945).

11. Testimony of Leo Pasvolsky, Special Assistant to the Secretary of State for International Organization and Security Affairs, Hearings, Committee on Foreign Relations, United States Senate, 79th Cong., 1st Sess., July 9, 1945, p. 145: "[T]he last article of this chapter provides for the extension of privileges and immunities to the Organization by the Members in their territories. That

Finally, the reports of both the House and Senate Committees dealing with the Headquarters Agreement, which significantly, as we shall see below, did provide for diplomatic immunity for those who came within its limits, support the conclusion that the Charter did not of its own force grant diplomatic privileges and immunities. The report of the Committee on Foreign Affairs of the House of Representatives states: "The committee have taken note that the Charter itself, in dealing with the question of immunities, does not specify diplomatic status. It simply states the requirement of such immunity as is necessary for the performance of the function." [12] And the report of the Senate Committee on Foreign Relations implies as much. [13]

Other events undermine petitioner's claim that diplomatic immunity was intended or granted under Article 105. The Charter came into force with respect to the United States on October 24, 1945. [14] In December, 1945 Congress enacted the International Organizations Immunities Act, [15] which was made applicable to the United Nations by Executive Order. [16] The House Committee Report on this Act stated that " * * * [T]he passage of this legislation is essential to implement our participation in [the United Nations]." [17] Section 7

thereof granted immunity to representatives of foreign governments to the United Nations for acts performed within their functions as such representatives. [18] This admittedly was a functional or restricted immunity. [19] If in fact a broad diplomatic immunity was extended by the Charter itself, this Congressional Act was without purpose as far as the United Nations was concerned.

Other evidence emphasizes that the Charter did not contemplate diplomatic immunity but intended only functional immunity. Paragraph 3 of Article 105, already referred to as designed to secure implementation and to define the scope of the "privileges and immunities" set forth in paragraphs 1 and 2, provides that the General Assembly may make recommendations or propose conventions with a view "to determining the details of the application of paragraphs 1 and 2." Pursuant thereto, the General Assembly, on February 13, 1946, proposed to member nations a General Convention on Privileges and Immunities. [20] The United States, to the present, has not acceded thereto. It did, however, enter into an entirely separate agreement with the United Nations, known as the Headquarters Agreement, which became operative late in 1947. Unlike Article 105, it expressly provided for diplomatic im-

is customary for an organization of this character, but just what kind of privileges and immunities would be extended would be a matter for future determination. The General Assembly is given the power to make recommendations with a view to determining the details of the application of this provision."

12. H.R.Rep. No. 1093, 80th Cong., 1st Sess., 11 (1947).

13. S.Rep. No. 559, 80th Cong., 1st Sess., 4 (1947).

14. See Historical Note to 22 U.S.C.A. § 287.

15. 59 Stat. 669 (1945), 22 U.S.C. §§ 288–288f (1958).

16. Exec. Order No. 9698, Feb. 19, 1946, 11 Fed.Reg. 1809.

17. H.R.Rep. No. 1203, 79th Cong., 1st Sess. (1945), reprinted in U.S.Code Cong.Serv. 946, 947 (1945).

18. 59 Stat. 671 (1945), 22 U.S.C. § 288d (1958).

19. United States Senate, Committee on Finance, Report on Immunities for International Organizations, S.Rep. No. 861, 79th Cong., 1st Sess. (1945) reprinted in United States Senate, Committee on Foreign Relations, Subcommittee on the United Nations Charter, Review of the United Nations Charter, Senate Doc. No. 87, 83d Cong., 1st Sess., 88, 92 (1954): "It should be noted that under this [Act] there would not be extended full diplomatic immunity from judicial process as in the case of diplomatic officers."

20. Resolution of General Assembly, 31st Plenary Meeting, February 13, 1946. United Nations General Assembly, Journal, 1st Sess., 569–75 (Jan.-March 1946) and United Nations General Assembly, Official Records, 1st Sess., Plenary Meetings, 644–50 (Jan.-Feb. 1946).

munity, the persons to whom and the terms under which it was to be accorded, to which reference will be made hereafter.[21]

The weakness of petitioner's reliance upon the Charter itself is perhaps highlighted by his argument that the "immunity specified under section 2 to 'representatives of the Members' is very different from the functional immunity that applies to 'officials of the Organization.'" Section 2 refers to both in the conjunctive; no distinction is made between them in the reference to "privileges and immunities." Yet petitioner would separate them and hold that a functional immunity, that is, for acts performed in an official capacity, was granted to "officials of the Organization," whereas a "representative" was favored with diplomatic immunity akin to that traditionally granted to an ambassador or public minister of a foreign state received by another state. There is no basis for this claimed distinction.

■■ The Court concludes that Article 105 of the Charter does not purport to nor does it confer diplomatic immunity. The broadest claim that can be made is that it is self-operative with respect to functional activities.[22] And even if it were so construed, it avails not the petitioner, since by its very language the immunity is confined to acts necessary for the independent exercise of functions in connection with the United Nations. Conspiracy to commit sabotage against the Government of the United States is not a function of any mission or member of a mission to the United Nations. Accordingly, the Court holds that the peti-

tioner does not enjoy diplomatic immunity against prosecution on the indictment by virtue of Article 105 of the United Nations Charter.

B. THE CLAIM OF DIPLOMATIC IMMUNITY UNDER THE HEADQUARTERS AGREEMENT.

(1) Is the Court concluded by the certificate of the State Department?

■ The development and growth of international organizations over the past two decades, particularly the United Nations as a world force, have brought into being new problems and concepts relating to the immunities and privileges to be accorded the organization, its officials and representatives of member states and their staffs. From the start it was evident that unless adequate immunity was provided to protect them in the exercise of their respective functions, the independence of the organization would be undermined and its effectiveness greatly hampered, if not destroyed. The location of the headquarters presents special problems to the host country and the organization. Access to the headquarters to all persons having legitimate business with the organization is required and, on the other hand, the host country is entitled to protection against the admission of persons likely to engage in activities subversive of its national interests and internal security. These matters are usually provided for by the basic charter or constitution, special agreements or national legislation.[23] With the United States as the site of the United Nations headquarters, our Gov-

21. 61 Stat. 756 (1947); United Nations, Official Records of the Second Session of the General Assembly, Resolutions, 91 (Sept. 16 to Nov. 29, 1947).

22. The Committee which drafted Article 105 expressed the view that it "laid down a rule obligatory for all members as soon as the charter would become effective." HANDBOOK, op. cit. supra, note 8 at 22. The Report of the Preparatory Commission of the United Nations, Dec. 23, 1945, in HANDBOOK, op. cit. supra, note 8 at 349 is in accord, as is a let-

ter from Ernest A. Gross, Legal Adviser to the Department of State, to a Subcommittee of the House of Representatives, Committee on Foreign Affairs, May 26, 1948, quoted in Gross, Immunities and Privileges of Delegations to the United Nations, 16 International Organizations 483, 504 n. 46 (1962).

23. See RESTATEMENT, op. cit. supra, note 6, Topic 4, Immunities Relating to International Organizations, Introductory Note a, p. 291.

ernment was particularly sensitive to the problem of assuring the independence and proper functioning of the United Nations, and also to the protection of its own security.[24] The Headquarters Agreement was one of the means adopted to protect the respective interests.[25]

Article V, section 15 thereof, provides in relevant part:

"(1) Every person designated by a Member as the principal resident representative to the United Nations of such Member or as a resident representative with the rank of ambassador or minister plenipotentiary,

"(2) such resident members of their staffs as may be agreed upon between the Secretary-General, the Government of the United States and the Government of the Member concerned,

" * * * shall, whether residing inside or outside the headquarters district, be entitled in the territory of the United States to the same privileges and immunities, subject to corresponding conditions and obligations, as it accords to diplomatic envoys accredited to it."

Under the above provisions, those who come within its embrace are entitled to the broad diplomatic privileges and immunities enjoyed by diplomatic envoys accredited to the United States. And there would appear to be no question that if the petitioner is entitled to the benefits of Article 15, he is immune from prosecution upon the charges contained in the indictment.[26] Petitioner relies upon section 15(2) as conferring diplomatic immunity upon him by reason of his position as an attache and a Resident Member of the Cuban Mission. The

Government challenges his claim, pointing out that the subsection expressly provides that immunity thereunder is accorded only to "such resident members * * * as may be agreed upon between the Secretary-General, the Government of the United States and the Government of the Member concerned." It denies that any such agreement was ever manifested, although it admits that an application therefor was made by the Secretary-General of the United Nations pursuant to the request of the Cuban Mission.

The prosecution has filed an authenticated affidavit of the Chief Protocol Officer of the Department of State certifying that the Government of the United States has not agreed to grant diplomatic immunity to petitioner under section 15(2) of the Headquarters Agreement, "and that he does not enjoy any diplomatic privileges and immunities under the aforesaid Article 15 of the Agreement." Accordingly, it presses that the Court is concluded by this certification.

Thus, a threshold question is presented. The precise issue before the Court is whether, in the light of section 15(2) of the Headquarters Agreement, certification by the Department of State that an individual acknowledged to be a resident attache of the Permanent Cuban Mission to the United Nations has not been "agreed upon" by the Government as entitled to diplomatic privileges and immunities thereunder, concludes the question.

A number of leading authorities do hold that the State Department certification is conclusive where the issue pertains to a diplomatic envoy accredited to the United States.[27] This Court is of

24. S.Rep. No. 559, 80th Cong., 1st Sess. (1947).

25. 61 Stat. 756 (1947), reprinted following 22 U.S.C.A. § 287. See also, International Organizations Immunities Act, 59 Stat. 669 (1945), 22 U.S.C. §§ 288–288f (1958).

26. See Bergman v. De Sieyes, 71 F.Supp. 334 (S.D.N.Y.1946), aff'd, 170 F.2d 360

(2d Cir. 1948); Hyde, International Law Chiefly as Interpreted and Applied by the United States, 1249ff. (2d Rev. Ed. 1945).

27. See In re Baiz, 135 U.S. 403, 435, 10 S.Ct. 854, 34 L.Ed. 222 (1890); Carrera v. Carrera, 84 U.S.App.D.C. 117, 174 F.2d 496 (1949); United States v. Coplon, 84 F.Supp. 472, 475 (S.D.N.Y.1950).

the view that such authorities do not control the question here presented.[28] There is a sharp distinction between a diplomatic envoy accredited to the Government of the United States and a representative of a member state to the United Nations, an international organization. The status of each is different and immunity rests upon and is derived from entirely different desiderata.[29]

Acceptance of a diplomatic envoy from a foreign government to the United States rests upon the exercise by our Executive of its power to conduct foreign affairs. It either accepts or rejects the diplomat in its sole and absolute discretion and, if he is received, he thereby is entitled, without more, under the Law of Nations, to full diplomatic immunity.[30] These are political judgments by the Executive Branch of the Government and the Court is concluded thereby. In contrast, a representative of a member state to an international organization, such as the United Nations, is designated by his Government entirely independent of the views of other member states and indeed of the Organization. The United States has no say or veto power with respect to such representative of any member state. These representatives acquire immunity only to the extent that it is granted by legislation, or by agreement, whether under the basic charter, a general convention, or a separate agreement, as in the instant case by the Headquarters Agreement.[31] Accordingly, whether or not a particular individual is entitled to immunity is to be decided within the framework of the applicable document. The Headquarters Agreement simply provides that the three designated parties are to agree upon those entitled to immunity. It contains no provision, nor is there any supplementary agreement, which defines how such agreement is to be manifested. The determination of a claim upon a disputed state of facts that one is entitled to immunity pursuant to that agreement is not a political judgment to be made by one of the parties thereto, but a judicial determination. The political decision in the first instance was made by the Government when it agreed that upon stipulated terms immunity was to take effect.

Whether, upon the facts presented by both the Government and the individual involved or his government, immunity exists by reason of the agreement, is not a political question, but a justiciable controversy involving the interpretation of the agreement and its application to the particular facts. In this instance the decision is for the Court and it is not concluded by the unilateral statement of the Government, a party to that agreement and to this controversy, that the individual is not entitled to immunity thereunder. The judicial determination of this issue does not intrude upon the Government's right under section 15(2) of the Headquarters Agreement to refuse its agreement that petitioner is entitled to diplomatic immunity or to agree that he is. Such a determination is not a review of its decision. Once the judicial

But cf. United States v. Rosal, 191 F. Supp. 663 (S.D.N.Y.1960). See also, Waltier v. Thomson, 189 F.Supp. 319 (S.D.N.Y.1960); Bank of China v. Wells Fargo Bank & Union Trust Co., 104 F.Supp. 59 (N.D.Cal.1952), modified on other points, 209 F.2d 467, 48 A.L.R.2d 172 (9th Cir. 1953).

28. But see, United States v. Coplon, 88 F.Supp. 915, 921 (S.D.N.Y.1950). But cf. Tsiang v. Tsiang, 194 Misc. 259, 86 N.Y.S.2d 556 (Sup.Ct.1949); Curran v. City of New York, 191 Misc. 229, 77 N.Y.S.2d 206 (Sup.Ct.1947), aff'd, 275 App.Div. 784, 88 N.Y.S.2d 924 (2d. Dept.

1949). See also, United States of Mexico v. Schmuck, 293 N.Y. 264, 56 N.E.2d 577 (1944); De Miglio v. Paez, 18 Misc. 2d 914, 189 N.Y.S.2d 593 (Sup.Ct.1959); Westchester County v. Ranollo, 187 Misc. 777, 67 N.Y.S.2d 31 (City Ct.1946).

29. RESTATEMENT, op. cit. supra, note 6, compare Chapter 4, Topic 3 with Chapter 4, Topic 4.

30. See Rev.Stat. § 4063 (1875), 22 U.S.C. § 252 (1958).

31. See Gross, supra note 22, at 505. See generally, RESTATEMENT, op. cit. supra, note 6, § 88 and comment.

finding is made that the Government agreed or did not agree, further inquiry is foreclosed, and the Government's decision as found is conclusive.

■ The scope of the inquiry is narrowly confined. Did the United States of America, as one of the parties to the Headquarters Agreement, make its decision under section 15(2) either that it agreed or did not agree that petitioner was entitled to diplomatic immunity? The Government's statement that it did not so agree is evidential but not conclusive. Petitioner asserts that by various acts the necessary agreement was manifested; the Government denies it. In this respect the instant case differs from Arcaya v. Paez,[32] strongly pressed by the Government, in which a State Department suggestion of immunity under section 15 of the Headquarters Agreement was held to be conclusive. The factual background against which the suggestion was made demonstrates it does not control the instant matter. There, a civilian, suing the defendant for libel, sought to attack as sham the defendant's appointment by the Venezuelan government as Alternate Representative of its Mission to the United Nations with the rank of Envoy Extraordinary and Minister Plenipotentiary, a position which, as already noted, by the express language of section 15(1), automatically carried with it diplomatic immunity. The State Department had formally recognized this appointment and the defendant's status thereunder, and issued a card which expressly stated that the defendant was entitled to diplomatic immunity under the Agreement. There was no issue, as there is in the instant case, as to whether or not it had made its decision. There the State Department's recognition of the defendant's status was its political determination and its statement to the Court foreclosed any

further inquiry as to the defendant's status. Consequently, refusal by the Court to recognize the legitimacy of the public act of the Venezuelan government in the light of the recognition by the Executive of the status of the defendant under the Agreement, might well have given rise to the very "antagonistic jurisdiction,"[33] the very "embarrassment of the executive in the conduct of foreign affairs,"[34] which is a basis of the judicial restraint in this area.

Thus we proceed to consider the petitioner's contention upon the merits.

(2) The claim that section 15(2) of the Headquarters Agreement contemplates agreement only as to categories and not as to individuals.

The petitioner's contention is that the clause "such resident members as may be agreed upon" contemplates an agreement with respect to categories of persons and does not require agreement upon persons within the category. The petitioner's main props in support of his contention are comments and reports of committees of the United Nations with respect to immunity proposals. While the unilateral views of any United Nations committee or member cannot serve to defeat the express language of the final agreement (the Headquarters Agreement), nonetheless, analysis of such comments and reports negates rather than supports the plaintiff's position.

First, subdivision 1 of section 15, in sharp contrast to subdivision 2, by its very terms grants diplomatic immunity to two distinct classes—(1) a principal resident representative of a member nation, and (2) a resident representative with the rank of ambassador or minister plenipotentiary. The status itself cloaks these limited and more important representatives to the United Nations with the same diplomatic immunity as that

32. 145 F.Supp. 464 (S.D.N.Y.1956), aff'd on opinion below, 244 F.2d 958 (2d Cir. 1957).

33. Ex Parte Peru, 318 U.S. 578, 588, 63 S. Ct. 793, 87 L.Ed. 1014 (1943).

34. New York and Cuba Mail Steamship Co. v. Republic of Korea, 132 F.Supp. 684 (S.D.N.Y.1955).

accorded to diplomatic envoys accredited to the United States.[35]

Despite the clearly expressed difference in paragraphs 1 and 2 of section 15, the petitioner seeks to make applicable to himself and to others in his status the automatic immunity of paragraph 1, extended to top representatives, on the ground that the United States Government has indicated agreement that attaches who are resident members of a mission as a class are entitled to diplomatic immunity.

To support the "class" agreement contention, petitioner relies upon a joint report of the Secretary-General and the Negotiating Committee which negotiated the Headquarters Agreement with the Department of State. A "Draft Convention" was proposed by the United Nations' negotiators for discussion purposes with the State Department. The "draft" was prepared without the participation of the United States delegation.[36] It contained a proposed article, "Resident Representatives to the United Nations," which, if adopted, would have accorded (without the agreement of the United States) full diplomatic immunity not only to representatives of member states to the United Nations, but to their staffs as well.[37] However, it did not meet with favor from our Government. And, oddly enough, it is a comment by the United Nations Negotiating Committee with reference to its rejection with which petitioner seeks to shore up his claim of diplomatic immunity. The Negotiating Committee, in reporting to the General Assembly, stated with respect to the nonacceptable Article:[38]

"The representatives of the United States accepted the principle of this article as it stood in the basis of discussions, *but felt that there should be some safeguard against too extensive an application.* The Secretary-General and the Negotiating Committee considered the new text to be a possible compromise." (emphasis supplied)

The "new text" as "a possible compromise" is Article V, section 15, of the Headquarters Agreement, with its sharp dichotomy of the basis upon which immunity is to be accorded under section 15(1) to high ranking representatives of member states, and under section 15(2) to resident members of their staffs.

The "safeguard against too extensive an application" of the carte blanche diplomatic immunity contained in the rejected draft proposal is the limitation set forth in section 15(2) that only "such resident members of their staffs as may be agreed upon" would be entitled to diplomatic immunity. It would indeed be ironic if under section 15(2), as the "possible compromise," any person employed as "a resident member" of a mission to the United Nations thereby gained, with-

---

35. See S.Rep. No. 559, 80th Cong., 1st Sess. 4 (1947).

36. See HANDBOOK, op. cit. supra, note 8, Joint Report by the Secretary-General and the Negotiating Committee on the negotiations with the authorities of the United States of America concerning the arrangements required as a result of the establishment of the seat of the United Nations in the United States of America 435, 436 (Sept. 4, 1946); United. Nations, General Assembly, Official Records, 1st Sess., Plenary Meetings, Report of the Sixth Committee 449–50 (Jan.-Feb. 1946).

37. HANDBOOK, op. cit. supra, note 8 at 402.
 The following is the full text of the Proposed Article V, section 25:

"Persons accredited to the United Nations by Members as resident representatives and their staffs, whether residing inside or outside the zone, shall be recognized by the Government of the United States of America as entitled on its territory to the same privileges and immunities as that Government accords to the diplomatic envoys accredited to it, and the staffs of these envoys."

38. HANDBOOK, op. cit. supra, note 8, Joint Report by the Secretary-General and the Negotiating Committee on the negotiations with the authorities of the United States of America concerning the arrangements required as a result of the establishment of the seat of the United Nations in the United States of America 435, 441 (Sept. 4, 1946).

out the express. agreement of the United States Government, the very same immunity accorded to the high ranking officials specifially enumerated in section 15(1). To accept this view is to say that section 15(2), as finally agreed upon, was self-defeating and denied to the United States the very safeguard it sought to secure.

Petitioner also relies upon events incident to the adoption of the Headquarters Agreement to support his position that section 15(2) only contemplated agreement as to classes of persons and not as to individuals. Here he advances the General Assembly resolution which authorized the Secretary-General to bring into force the Headquarters Agreement. In this resolution, the General Assembly:

"*Decides* to recommend to the Secretary-General and to the appropriate authorities of the United States of America to use section 16 of the General Convention on the Privileges and Immunities of the United Nations as a guide in considering— under sub-sections 2 and the last sentence of section 15 of the above-mentioned Agreement regarding the Headquarters—what classes of persons on the staff of delegations might be included in the lists to be drawn up by agreement between the Secretary-General, the Government of the United States of America, and the Government of the Member State concerned." [39]

In effect, the petitioner, on the basis of a recommendation by the General Assembly, not even binding upon its own Secretary-General, seeks to incorporate by reference section 16 of the General Convention on Privileges and Immunities of February 13, 1946, which to this date has not been accepted by the United

States. The fact is that no definitive agreement as to "classes of persons on the staffs" has ever been entered into.

Finally, and most important, even were it acknowledged that section 16 of the General Convention or some similar provision was the guide in considering what classes of persons might be included, and even if "attaches" were included,[40] it would not necessarily follow that automatically all within the category were agreed upon as entitled to diplomatic immunity. It would simply qualify them as eligible for inclusion on the list. This becomes clear when it is recognized that the broad category of "Resident Members of their Staffs" includes, but is not limited to, charge d'affaires, attaches, advisers, technical experts, interpreters, secretaries of missions, secretaries, stenographers, clerks, governesses, tutors and chauffeurs.

The argument that unless petitioner's construction of class agreement is adopted the United States would obtain "a discriminatory, unilateral and effective control of and sanctions against nations of equal sovereignty in the United Nations" is unpersuasive. As already demonstrated, full diplomatic immunity is accorded under subdivision 1 of section 15 to top echelon representatives of member nations identical to that accorded to accredited diplomats to the United States. As to their staff members, pending agreement by the United States under section 15(2), which would entitle them to diplomatic immunity, there is available under the International Organizations Immunities Act the immunity necessary for the independent exercise of their functions, apart from Article 105 of the Charter, if in fact it is self-executing. No member state is prevented from ap-

39. Resolution 169 (11), Hundred and First Plenary Meeting, 31 October 1947, United Nations Official Records of the Second Session of the General Assembly, Resolutions 91–92 (Sept. 16, 1947–Nov. 29, 1947).

40. The much vaunted section 16 of the General Convention does not serve petitioner's purposes, since it does not refer to either attaches or staff members. Article IV, of which section 16 is a part, is headed, "The Representatives of Members." Section 16 provides, "In this article the expression 'representatives' shall be deemed to include all delegates, deputy delegates, advisers, technical experts and secretaries of delegations."

pointing whomever it will to serve on the resident staff of its mission to the United Nations, but the United States, under section 15(2), is not required, simply by reason of one's employment in a particular category, to grant diplomatic immunity. It retains the right thereunder to agree or not to agree that diplomatic immunity shall extend to individuals who qualify under the broad category "Resident Members of their Staffs." While it has exercised this right sparingly, it has refused, in the instance of at least five individuals, to agree to the request for immunity, without objection by either the Secretary-General or the member state who submitted the request.

The construction advanced would mean that a member state of the United Nations which may be hostile to our interests is free to send to the United States individuals designated as resident members of their staffs, to engage in conduct destructive of our national interest and security and yet have them protected from criminal prosecution on the theory that their designated status cloaked them with diplomatic immunity. It would open the flood gates for the entry of saboteurs, agents provocateur and others under a built-in guarantee that no matter what the criminal conduct, the Government could not prosecute them.[41]

The language of the section controls. There is nothing in its history or in the practice under it to support petitioner's claim. To accept his contention would in effect amend section 15(2) by inserting therein the words "classes of" to read "such classes of resident members * * *."

The Court holds that the status of petitioner as an attache and resident member of the Cuban Mission does not by itself entitle him to diplomatic immunity under section 15(2) and that unless there was the agreement of the United States, as provided therein, the prosecution is not barred. The petitioner claims there was such agreement.

(3) The claim that the United States did agree that petitioner was entitled to diplomatic immunity.

The essence of petitioner's claim is that the issuance of the visa and the landing permit constituted, under the facts and law, the agreement of the Government of the United States that he was entitled to diplomatic privileges and immunities under section 15(2) of the Headquarters Agreement. This requires reference to facts attendant upon and subsequent to his entry into the United States and the procedure whereby the agreement of the United States is manifested.

As already noted, the petitioner entered the United States on October 3, 1962 with a visa issued by the Department of State on September 19, 1962 and a landing pass issued by the Immigration and Naturalization Service on October 3, 1962 upon his arrival at New York City, the port of entry. The visa was issued by the State Department following a

41. Attention, however, is directed to the qualification attached by the Congress to its approval of the Headquarters Agreement. 61 Stat. 756 (1947):

SECTION 6. Nothing in the agreement shall be construed as in any way diminishing, abridging, or weakening the right of the United States to safeguard its own security and completely to control the entrance of aliens into any territory of the United States other than the headquarters district and its immediate vicinity * * * and such areas as it is reasonably necessary to traverse in transit between the same and foreign countries. Moreover, nothing in section 14 of the agreement with respect to facilitating entrance into the United States by persons who wish to visit the headquarters district and do not enjoy the right of entry provided in section 11 of the agreement shall be construed to amend or suspend in any way the immigration laws of the United States or to commit the United States in any way to effect any amendment or suspension of such laws."

See Gross, supra note 22. See also, Immigration and Nationality Act of 1952, § 102, 66 Stat. 173 (1952), 8 U.S.C. § 1102 (1958); H.R.Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in U.S. Code Cong. and Admin. News 1653, 1686 (1952).

formal request therefor by the Cuban Mission contained in a communication dated September 12th addressed to the United States Mission to the United Nations. The Cuban Mission enclosed a diplomatic passport issued to petitioner by the Cuban government, and also advised of petitioner's appointment as "Diplomatic Attache at this Permanent Mission." Earlier that day, the Cuban Mission also formally notified the Secretary-General of the United Nations of petitioner's appointment to its staff.

State Department Regulation 22 C.F.R. § 41.12 provides that a visa issued to a nonimmigrant alien shall bear an appropriate symbol to show the classification of the alien. The visa issued to petitioner bears the symbol G–1, as does the landing card which was issued by the Immigration Service. The symbol is applicable to the class of "Principal Resident Representative of Recognized Foreign Member Government to International Organization, his Staff and Members of Immediate Family." [42] Section 101 (a) (15) (G) (i) of the Immigration Act,[43] cited in the Regulation as the basis for the G–1 classification, provides that a nonimmigrant alien includes:

"[A] designated principal resident representative of a foreign government recognized de jure by the United States, which foreign government is a member of an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Or-

ganizations Immunities Act (59 Stat. 669), accredited resident members of the staff of such representatives, and members of his or their immediate family."

Petitioner also stresses section 214(b) of the Act, which provides: [44]

"Every alien shall be presumed to be an immigrant until he establishes to the satisfaction of the consular officer, at the time of application for a visa, and the immigration officers at the time of application for admission, that he is entitled to a nonimmigrant status under section 1101 (a) (15) of this title."

On all the foregoing,[45] the petitioner contends that the State Department expressly agreed upon his immunity status. His position is that the State Department, by the issuance of that visa (two weeks before his entry into the United States), not only recognized he had the status qualifying him for immunity under section 15(2) of the Headquarters Agreement, but agreed he was entitled thereto. He argues further that the agreement was subsequently confirmed by his admission at the port of entry with a landing card issued by the Immigration Service evidencing the same status—in sum, that the Government of the United States, by reason of the issuance of the visa and the landing card, following advice by the Cuban Mission of petitioner's appointment to its staff as a resident member, agreed he was entitled to diplomatic immunity under the Headquarters Agreement and, once he

---

42. 22 C.F.R. § 41.12 (1962 Supp.)—*Classification Symbols.*

"A visa issued to a nonimmigrant alien within one of the classes described in this section shall bear an appropriate symbol to be inserted by the consular officer in the space provided in the visa stamp to show the classification of the alien. The following symbols shall be used:

\* \* \* \* \*

Principal resident representative of recognized foreign member government to international organization, his staff, and members of immediate family. \* \* \* G–1."

43. 66 Stat. 166 (1952), 8 U.S.C. § 1101 (a) (15) (G) (i) (1958).

44. 66 Stat. 189 (1952), 8 U.S.C. 1184(b) (1958).

45. Petitioner also advances 22 C.F.R. § 41.50(a) (1962 Supp.), which provides, "An alien shall be classifiable under the provisions of section 101(a) (15) (G) of the Act if he establishes to the satisfaction of the consular officer that he is within one of the classes described in that section and that he seeks to enter \* \* \* the United States in pursuance of his official duties."

gained entry into the United States, only routine procedure remained to evidence its agreement.

The Government concedes that the G–1 classification on the visa issued to the relator accurately describes his status, but denies that it carries with it agreement that petitioner is entitled to diplomatic immunity under section 15 of the Headquarters Agreement. The Government submits that under section 11 [46] of the Headquarters Agreement it was obligated to permit petitioner's transit to and from the United Nations Headquarters District and, under section 13, [47] to grant the necessary visa to effect his entry into the United States for that purpose.

Following the effective date of the Headquarters Agreement, a procedure was established to implement the required tri-partite consent under section 15(2) with respect to those qualified thereunder. The mission involved, in the instance of an individual other than a permanent representative of the rank of ambassador or minister, notifies the Secretary-General of its request that the staff member be granted the benefits of section 15(2) and asks that the necessary arrangements therefor be made. [48] The Secretary-General forwards the request to the United States Mission, which sends it on to the State Department. If the State Department gives its agreement, it notifies the United States Mission which, in turn, advises the United Nations, as well as the individual, in a formal communication which, in part, reads:

> "Under the terms of the Headquarters Agreement between the United States and the United Nations, brought into force on November 21, 1947, and on the basis of certification submitted by your mission, with the concurrence of the Secretary General of the United Nations, you are entitled in the territory of the United States to the privileges and immunities of a diplomatic envoy under Section 15 of the Headquarters Agreement."

In addition, the individual's name is published in a list issued by the United States Mission to the United Nations as "recognized by the Department of State as entitled to diplomatic privileges and immunities * * * under the provisions of Section 15 of the Headquarters Agreement * * *."

Significantly, in the instant case the Cuban Mission, on October 15, 1962, communicated with the Secretary-General "so that *request* may be made to the American Mission for the privileges and immunities corresponding to his rank." (Emphasis supplied.) Thereafter, the Secretary-General, on October 19th, submitted this request to the United States Mission. The Ambassador of the United States Mission to the United Nations transmitted it, on October 23rd, to the State Department. Equally significant, the communication from the United States Mission to the State Department sets forth that petitioner's name was "submitted by UN for *possible inclusion* on list under Section 15 of the Headquarters Agreement." (Emphasis supplied.) At no time did petitioner receive a notification from the United States Mission that the request of his mission had been acted upon or that he was entitled to im-

---

46. Section 11 of the Headquarters Agreement provides:

 "The federal, state or local authorities of the United States shall not impose any impediments to transit to or from the headquarters district of (1) representatives of Members or officials of the United Nations * * * or the families of such representatives or officials."

47. Section 13 provides in part: "When visas are required for persons referred to [in section 11], they shall be granted without charge and as promptly as possible."

48. United Nations, General Information for the Guidance of Permanent Missions to the United Nations, Article IV, Requests for Diplomatic Privileges and Immunities, § 11 (1962).

 The procedure under § 11 is quite different from that in the instance of a permanent representative of the rank of ambassador or minister outlined in *id.* at § 10.

munity in accordance with section 15(2). His name was never published on a list of persons entitled thereto. On the other hand, neither did the Government notify the petitioner, his mission or the Secretary-General that he was not "agreed upon" for immunity.

 I am of the view that petitioner's contention cannot be upheld. To do so is to transmute the G-1 visa issued by the State Department into the agreement of the United States required under section 15(2) before diplomatic immunity extends to staff members of missions to the United Nations. The fact that the G-1 visa recognized that petitioner had the status encompassed within section 15(2) does not mean that by reason thereof the United States gave the required agreement thereunder. The visa was issued at the request of the Cuban Mission upon presentation of a diplomatic passport issued by the Cuban government and its representation of petitioner's appointment as "diplomatic attache." Since the designation rested with the Cuban government, the United States was obligated under sections 11 and 13 of the Headquarters Agreement not to impose any impediment in his transit to and from the Headquarters District and to provide him with the necessary visa. The visa was the basic document of entry into the United States enroute to his post with his mission.

Petitioner argues that the State Department did not have to issue a G-1 visa in order to fulfill its obligations under the Headquarters Agreement; that so long as petitioner was accorded free access to the Headquarters District, the obligations of the United States Government were met. But as the prosecution contends, once the State Department determined that petitioner, upon the documents and representations contained therein, qualified for a G-1 visa, its issuance to the petitioner was pursuant to rules promulgated under the Immigration and Naturalization Act.

The question of the agreement of the United States Government to diplomatic immunity was entirely separate from facilitating petitioner's entry to assume his duties with his mission.

 I conclude that the Government of the United States did not, by the issuance of the visa and the landing permit, give its agreement that petitioner, on his entry into the United States to assume his duties as a member of the Cuban Mission, was thereby entitled to diplomatic immunity under section 15(2) of the Headquarters Agreement.

## C. THE CLAIM OF DIPLOMATIC IMMUNITY UNDER THE LAW OF NATIONS.

Here the petitioner's position is that under the Law of Nations he had diplomatic immunity from the time of his entry until the Government of the United States took definitive action upon the request of the Cuban Mission that he be "agreed upon" for diplomatic immunity under the Headquarters Agreement. Again, the claim centers in part about the G-1 visa and landing permit. He urges in substance that by their issuance the United States acknowledged his status for the purpose of entry into the United States to assume his duties with his mission, aware that he was eligible for diplomatic immunity. Accordingly, he contends that he was entitled to diplomatic immunity from the time of his entry on the same principle as that applicable under the Law of Nations to diplomats awaiting acknowledgment by governments to which they are accredited and which attaches even before they have been received by it—in fine, that until he was either agreed upon or rejected in response to his government's request, he was protected. He cites leading authorities on the Law of Nations and Supreme Court rulings in support of this doctrine favoring diplomatic envoys.[49] These are accepted as authoritative, but they are inapplicable.[50]

49. Petitioner cites, inter alia, The Exchange, 7 Cranch 116, 11 U.S. 116, 3 L. Ed. 287 (1812); 1 Oppenheim, International Law, § 376 (Lauterpacht Ed.).

50. Cf. United States v. Melekh, 193 F. Supp. 586, 598–99 (N.D.Ill.1961); United States v. Melekh, 190 F.Supp. 67, 85–89 (S.D.N.Y.1960).

 Petitioner's path is blocked by the same reasoning upon which the Court rejected the Government's position that its unilateral determination that he was not entitled to diplomatic immunity under the Headquarters Agreement was conclusive. As the Government's suggestion of an analogy to diplomats accredited to the United States was refused above, so is petitioner's in this instance. It is the Headquarters Agreement, the Charter and the applicable statutes of the United States that govern the determination of his rights, not the Law of Nations. The Law of Nations comes into play and has applicability in defining the nature and scope of diplomatic immunity only once it is found a person is entitled thereto under an applicable agreement or statute.

The Court concludes that petitioner is not entitled to diplomatic immunity by virtue of the Law of Nations.

## D. THE CLAIM THAT PETITIONER MAY ONLY BE PROSECUTED BEFORE THE SUPREME COURT OF THE UNITED STATES.

Finally, petitioner contends that by virtue of the Constitution and the Judicial Code he may be prosecuted and tried only before the Supreme Court of the United States.

Article III, section 2, clause 2, of the Constitution provides:

"In all Cases affecting Ambassadors, other public Ministers and Consuls, * * * the supreme Court shall have original Jurisdiction."

Section 1251(a) of Title 28 United States Code, provides that the Supreme Court shall have original and exclusive jurisdiction of:

"(2) all actions or proceedings against ambassadors or other public ministers of foreign states or their domestics or domestic servants, not inconsistent with the law of nations."

He argues that the expression "[A]mbassadors or other public [M]inisters," used in the foregoing, embraces all officials performing diplomatic functions, including attaches. Thus he contends under the constitutional provision and the statute that the Supreme Court has not only original, but exclusive jurisdiction and that this Court lacked jurisdiction to receive the indictment from the grand jury, to detain him, or to proceed with the prosecution.

It has already been emphasized that petitioner's entry into the United States was to serve as an attache and Resident Member on the staff of the Cuban Mission to the United Nations. The presence here of the principal representative of his government to the United Nations is solely because of its membership in the United Nations. He, as well as the petitioner herein, serves no function in relation to the Government of the United States. Neither is accredited to the United States. Indeed, in view of the lack of diplomatic relations between the United States and Cuba, petitioner, from the day of his entry to the present, could not have functioned in a diplomatic capacity vis-a-vis the United States; and, of course, this is equally true of the principal representative of the Cuban Mission and its members.

 The constitutional provision and the statute are designed to apply to diplomatic representatives of foreign governments accredited to the United States. International organizations which have come into full bloom only in the last several decades were not envisaged by the Founding Fathers; clearly it was not within their contemplation that staff members of missions to such international organizations were included within the term "Ambassadors and other public Ministers." [51] In the light of the

---

51. Accord, United States v. Coplon, 84 F. Supp. 472 (S.D.N.Y.1949). Cf. United States v. Melekh, 193 F.Supp. 586, 597–98 (N.D.Ill.1961); United States v. Melekh, 190 F.Supp. 67, 89 (S.D.N.Y. 1960). But see Friedberg v. Santa Cruz, 274 App.Div. 1072, 86 N.Y.S.2d 369 (2d Dept.1949); De Miglio v. Paez, 18 Misc.

foregoing discussion, the petitioner is not a "public minister" within the meaning of the constitutional or statutory provisions. Such an all-embracing definition is not justified.

This Court has jurisdiction of the petitioner under the indictment returned by the grand jury.

The petition for a writ of habeas corpus is dismissed upon the merits.

See also 183 F.Supp. 443.

2d 914, 189 N.Y.S.2d 593 (Sup.Ct.1959). See also, Arcaya v. Paez, 145 F.Supp. 464, 468–69 (S.D.N.Y.1956), aff'd on

opinion below, 244 F.2d 958 (2d Cir. 1957).